J-E02007-14

2014 PA Super 281

| | | |
|---|---|---|
| JOSEPH AND APRIL PARR, HUSBAND AND WIFE, INDIVIDUALLY AND AS PARENTS AND NATURAL GUARDIANS OF SAMANTHA PARR, | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : | |
| FORD MOTOR COMPANY, McCAFFERTY FORD SALES, INC. d/b/a McCAFFERTY AUTO GROUP, McCAFFERTY FORD OF MECHANICSBURG, INC., AND McCAFFERTY FORD COMPANY, | : : : : : : : | |
| Appellees | : | No. 2793 EDA 2012 |

Appeal from the Judgment Entered August 31, 2012,
In the Court of Common Pleas of Philadelphia County,
Civil Division, at No. 002893, December Term, 2009.

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, SHOGAN, ALLEN, OTT, WECHT, STABILE AND JENKINS, JJ.

OPINION BY SHOGAN, J.:**FILED DECEMBER 22, 2014**

Plaintiffs-Appellants, Joseph and April Parr ("the Parrs"), husband and wife, individually and as parents and guardians of their minor daughter, Samantha Parr, appeal from the August 31, 2012 judgment of the Court of Common Pleas of Philadelphia County, which was entered following the denial of the Parrs' motion for post-trial relief.  Appellees are Defendants Ford Motor Company, McCafferty Ford Sales, Inc. doing business as

McCafferty Auto Group, McCafferty Ford of Mechanicsburg, Inc., and McCafferty Ford Company (collectively "Ford"). Following our review of the voluminous record, and in consideration of the applicable law and arguments of the parties, we affirm.

On July 21, 2009, the Parrs' 2001 Ford Excursion, which they purchased as a "used" vehicle in 2007, was struck by a van that ran a stop sign, causing the Parrs' vehicle to spin clockwise, hit a guardrail, and roll down a nineteen-foot embankment. Amended Complaint, 8/26/11, at ¶¶ 14, 26–28; N.T., 3/8/12, at 30. Joseph Parr was driving at the time of the accident; his wife, April Parr, their three minor children, and Margaret Parr, Joseph's mother, were occupants of the vehicle. Amended Complaint, 8/26/11, at ¶¶ 20–25; N.T., 3/8/12, at 31. All passengers, who all wore their seatbelts, were injured; occupants on the driver's side of the vehicle, Joseph Parr and children Tyler and Carilann Parr, sustained comparatively minor injuries. Amended Complaint, 8/26/11, at ¶¶ 20–25, 31. Margaret Parr, Joseph Parr's fifty-seven-year-old mother, who sat in the second row on the passenger side, is not involved in this case, and her injuries were not identified in the amended complaint. Amended Complaint, 8/26/11, at ¶ 25.[1] Daughter Samantha, who was sitting in the third row on the passenger

---

[1] Parrs' Exhibit P-8, which is an expert report by Donald Friedman to Parrs' counsel dated June 29, 2011, describes Margaret Parr's injury as "a

side, sustained a fractured skull, broken collarbone, fractured eye orbital, a lacerated liver, and facial lacerations. Amended Complaint, 8/26/11, at ¶ 30. April Parr, sitting in the front passenger seat, sustained a spinal cord injury and was rendered a quadriplegic. Amended Complaint, 8/26/11, at ¶ 29; N.T., 3/8/12, at 33.

Emergency responders employed the jaws of life[2] to extract April Parr from the Excursion; during that process, the roof and pillar structures of the vehicle were destroyed. N.T., 3/9/12 (Afternoon Session), at 35–38. The parties stipulated that shortly after the accident in July 2009, the Parrs' Ford Excursion was released to the Parrs' insurer, which sold the vehicle, and the automobile was destroyed. N.T., 3/15/12 (Morning Session), at 30–31.

The Parrs filed a complaint against Ford Motor Company and the Ford dealership that sold them their 2001 Ford Excursion on December 28, 2009, and an amended complaint on August 26, 2011, contending that April Parr's and Samantha Parr's injuries resulted from roof crush when the automobile rolled down the embankment. Amended Complaint, 8/26/11, at ¶¶ 28, 40. The Parrs alleged that the vehicle's roof and restraint system were defectively designed under the crashworthiness doctrine of strict products

---

fractured hand." Parrs' Exhibit P-8, Report of Donald Friedman, 6/29/11, at 3.

[2] "Jaws of Life," a trademark of Hurst Performance, Inc., are hydraulic rescue tools used by emergency rescue personnel to assist vehicle extrication of crash victims. http://www.jawsoflife.com.

liability, and they asserted additional claims sounding in negligence. Amended Complaint, 8/26/11.

Trial in the matter commenced on March 6, 2012, and continued over the ensuing three weeks, culminating on March 23, 2012, with a defense verdict. The jury indicated on the verdict form that the Parrs did not prove: (1) that the Excursion's roof design was defective when it "left the control of Ford and that there was an alternative, safer design that was practicable under the circumstances," or (2) "that Ford was negligent in its design of the roof structure on the 2001 Ford Excursion when it left Ford's control and that there was an alternative, safer design that was practicable under the circumstances." Jury Verdict Form, 3/23/12, at ¶¶ 1, 3. The jury thus did not reach the issues of causation or damages.

The Parrs filed post-trial motions on March 29, 2012. Both parties filed briefs, and the trial court denied the motions on August 31, 2012, entering judgment in favor of Ford that day. This timely appeal followed on September 10, 2012, in which the Parrs challenge several pretrial evidentiary rulings and an aspect of the trial court's charge to the jury. Both the trial court and the Parrs complied with Pa.R.A.P. 1925.

A panel of this Court filed a memorandum affirming the judgment in favor of Ford. ***Parr v. Ford Motor Company***, 2793 EDA 2012, ___ A.3d ___ (Pa. Super. filed December 24, 2013) (unpublished memorandum).

Thereafter, the Parrs filed a motion for reargument *en banc*. We granted the motion and heard oral arguments on August 5, 2014. This matter is now ripe for disposition.

The Parrs raise the same four issues in this appeal that they identified in their Pa.R.A.P. 1925(b) statement, which are as follows:

> A.    Whether the Trial Court committed an error of law and abused its discretion when it denied the Parrs' Motion *in Limine* No. 1 to preclude Ford from presenting evidence of its "diving," "torso augmentation" theory, which was discredited and superseded by the National Highway Traffic Safety Administration (NHTSA)'s Final Rule dated May 12, 2009?
>
> B.    Whether the Trial Court committed an error of law and abused its discretion when it granted Ford's Motion *in Limine* No. 3 to preclude references to post-2001 NHTSA standards and rulemaking documents dated 2001 to present, on the basis that the Excursion was originally manufactured and sold in 2001?
>
> C.    Whether the Trial Court committed an error of law and abused its discretion when it granted Ford's Motion *in Limine* No. 9 and altogether precluded the Parrs from offering statistical evidence prepared by NHTSA, IIHS, FARS, and/or NASS as to rollover fatalities involving the 2001 Excursion and comparable vehicles on the basis that the Parrs were unable to prove that the statistics derived from other rollover accidents that [sic] were virtually identical to the subject accident?
>
> D.    Whether the Trial Court committed an error of law and abused its discretion when it denied the Parrs' Motion *in Limine* No. 10 to preclude Ford from:  (a) presenting—and consequently filling the record with—evidence that the 2001 Excursion was not preserved; and (b) obtaining a spoliation charge when Ford suffered no prejudice resulting from the vehicle's destruction since neither party's experts had access to the vehicle and since Ford's theory was based upon the assumption that all occupants in rollover vehicles are injured in the same way?

The Parrs' Brief at 7–8.

We note initially that our Supreme Court adopted section 402A of the Restatement (Second) of Torts in **Webb v. Zern**, 220 A.2d 853 (1966), and reaffirmed the Second Restatement's vitality in **Tincher v. Omega Flex, Inc**., ___ A.3d ___, ___, 2014 WL 6474923 *62 (Pa. filed November 19, 2014 ("Pennsylvania remains a Second Restatment jurisdiction"). Section 402A states:

> **§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer**
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
>
>> (a) the seller is engaged in the business of selling such a product, and
>>
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>>
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[3]

RESTATEMENT (SECOND) OF TORTS, § 402A (1965).

---

[3] The term "seller" includes the "manufacturer" of a product. RESTATEMENT (SECOND) OF TORTS, § 402A, cmt. f.

In order to prevail in such a product liability case, the plaintiff must establish: (1) that the product was defective; (2) that the defect existed when it left the hands of the defendant; and (3) that the defect caused the harm. **Reott v. Asia Trend, Inc**., 7 A.3d 830 (Pa. Super. 2010). A product is defective "when it is not safe for its intended use." **Weiner v. American Honda Motor Co., Inc.**, 718 A.2d 305, 308 (Pa. Super. 1998).

The crashworthiness doctrine most typically arises in the context of motor vehicle accidents. **See**, **e.g.**, **Raskin v. Ford Motor Co.**, 837 A.2d 518 (Pa. Super. 2003). It was first explicitly recognized as a specific subset of product liability law by this Court in **Kupetz v. Deere & Co., Inc.**, 644 A.2d 1213 (Pa. Super. 1994), and is defined as "the protection that a motor vehicle affords its passenger against personal injury or death as a result of a motor vehicle accident." **Id.** at 1218.

> A crashworthiness claim requires proof of three elements. First, the plaintiff must prove that the design of the vehicle was defective, and that at the time of design an alternative, safer, and practicable design existed that could have been incorporated instead. Second, the plaintiff must identify those injuries he or she would have received if the alternative design had instead been used. Third, the plaintiff must demonstrate what injuries were attributable to the defective design.
>
> In recognizing the crashworthiness doctrine in **Kupetz**, this Court relied upon our Supreme Court's prior decision in **McCown v. International Harvester Co.**, 463 Pa. 13, 342 A.2d 381 (1975), which adopted the principle tenet of the crashworthiness doctrine, *i.e.*, manufacturers are strictly liable for defects that do not cause the accident but nevertheless cause an increase in the severity of injuries that would have occurred without the defect.

***Gaudio v. Ford Motor Company***, 976 A.2d 524, 532 (Pa. Super. 2009) (some citations omitted).

The parties herein differed regarding how the injuries to the Parrs occurred. The Parrs asserted that as the Excursion rolled down the embankment, the driver's side led the roll, and the roof over the "trailing" passenger side of the vehicle crushed into the passenger compartment. Amended Complaint, 8/26/11, at ¶ 27, 28. In support, the Parrs alleged that April Parr and Samantha Parr, who sat on the passenger side of the vehicle,[4] sustained significant injuries "as a result of the collapsing roof," whereas the passengers on the driver's side of the Excursion, "over which the roof did not significantly collapse," incurred minor injuries. ***Id***. at ¶¶ 29–31.

Ford's position was premised on a "diving" and "torso augmentation" defense. Ford's experts opined that when the Excursion flipped upside down, centrifugal force pulled passengers out of their seats and pushed their heads against the vehicle's roof, a phenomenon called diving. N.T., 3/7/12 (Morning Session), at 36–38. April Parr's head theoretically was already in contact with the roof when the roof struck the ground as the vehicle rolled over; as her head came to an abrupt halt, her torso continued to move,

---

[4] Notably absent is any reference to Margaret Parr, who also sat on the passenger side and who, according to Donald Friedman's report, sustained a fractured hand.

causing her to break her neck. *Id*. This phenomenon is known as torso augmentation. *Id*. at 38. Mr. Michael J. Leigh, Ford's expert on roof strength who the Parrs called on cross-examination, explained Ford's theory regarding why April Parr sustained significant injuries compared to Joseph Parr, as follows:

> **Q.** Well, they [Joseph and April] both rolled over, they both were subjected to centrifugal force. But if you looked at that roof, the roof over April Parr had what we call crush or deformation of a total residual of 11 inches; is that right?
>
> **A.** I know that the roof was significantly deformed on that side of the vehicle. And that means that that part of the roof sustained a significant impact.
>
> And if the other side of the roof was not deformed like that, that means that side of the roof did not sustain a significant impact.
>
> And if the roof over Mr. Parr did not sustain a significant impact, then I'm not surprised that he did not get injured.
>
> But I would not be surprised at all that his head did touch the roof in that event because if he's that tall and experiencing centrifugal force, his head is going to touch the roof, as well. He was just fortunate enough not to experience the impact that, unfortunately, his wife experienced.
>
> **Q.** And you're saying it didn't come about from this 11 inches of crush or deformation? It just came from centrifugal force; right?
>
> **A.** The deformation is an indication of the severity of the impact that that part of the roof experienced.
>
> The injury that Mrs. Parr received is an indication of the severity of the impact that she experienced being in the same place as that part of the roof. So her injury and the deformation are associated with the impact, but it doesn't mean that the deformation of the roof caused her injury. You can't go that far.

All you can say is that the deformation and the injury are associated with the impact. And Mr. Parr didn't experience that severe of an impact. That's the difference.

N.T., 3/7/12 (Morning Session), at 39–41.

We proceed to address the Parrs' challenges to the trial court's evidentiary rulings. A motion *in limine* is used before trial to obtain a ruling on the admissibility of evidence. **Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.**, 933 A.2d 664 (Pa. Super. 2007). "It gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury." **Commonwealth v. Reese**, 31 A.3d 708, 715 (Pa. Super. 2011) (*en banc*). A trial court's decision to grant or deny a motion *in limine* "is subject to an evidentiary abuse of discretion standard of review." **Id.**

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. **Commonwealth Financial Systems, Inc. v. Smith**, 15 A.3d 492, 496 (Pa. Super. 2011) (citing **Stumpf v. Nye**, 950 A.2d 1032, 1035–1036 (Pa. Super. 2007)). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." **Grady v. Frito–Lay, Inc.**, 576 Pa. 546, 839 A.2d 1038, 1046 (Pa. 2003).

**Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.**, 77 A.3d 1, 11 (Pa. Super. 2013). In addition, "to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial

to the complaining party." ***Winschel v. Jain***, 925 A.2d 782, 794 (Pa. Super. 2007) (citing ***McClain v. Welker***, 761 A.2d 155, 156 (Pa. Super. 2000)).

The Parrs' motions *in limine* numbers one, three, and nine all dealt with the issue of "roof crush" versus "diving" and "torso augmentation." In particular, the Parrs' motion *in limine* number one sought to preclude Ford from presenting evidence of its diving/torso augmentation theory, which the Parrs asserted was discredited and superseded by the National Highway Traffic Safety Administration (NHTSA)'s Final Rule dated May 12, 2009. The Parrs assert Ford admitted that in 2001, comparable vehicles existed with much stronger roofs than that of the Excursion. Ford acknowledged that roof crush may cause injuries in some cases but defended, in this case, on the basis of its diving/torso augmentation theory.

The Parrs asserted pretrial, at trial, and in their appellate brief as follows:

> Although N[H]TSA's "roof crush" theory versus the industry's "diving/torso augmentation" was a heavily contested issue for years prior to <u>2001</u>, the year of the Excursion's manufacture, in 2009, NHTSA determined <u>once and for all</u> that "roof crush" and not "diving/torso augmentation" was the cause of head and neck injuries—such as those sustained by Mrs. Parr—among belted occupants in rollover accidents. NHTSA based its finding upon extensive epidemiological studies from 2001-2009, and resultantly promulgated its Final Rule on Federal Motor Vehicle Safety Standard (FMVSS) No. 216 on May 12, 2009, which required more stringent roof-crush standards.

The Parrs' Brief at 26 (emphasis in original). The Parrs reference the following:

> Roof Crush as a Cause of Injury
>
> A number of commenters including GM, Ford, [and] Nissan[5] . . . stated that the statistical correlation . . . found between roof intrusion and injury does not establish a causal relationship between roof deformation and injury. . . . [T]he studies . . . merely suggest that there is a relationship. . . . "[W]hen you compare rollover accidents that have significant roof/pillar deformation with other rollover accidents that have very little or no roof/pillar deformation, you are not comparing similar accidents with respect to roof-to-ground impact severity. Just the fact that two vehicles are in a rollover with greater than 2 quarter turns does not mean they are in the same or even similar impact severities." . . . Ford stated that "[t]he amount of roof deformation is only an indication of the severity of the impact between the roof and the ground." . . . GM stated that "[o]bservations of injury occurrence at the end of a rollover collision reveal nothing regarding the relationship of roof deformation, roof strength, or roof strength-to-weight ratio injury causation." Nissan stated that deformation and injury severity are both independently associated with roof impact severity.

The Parrs' Brief at 17; "Federal Motor Vehicle Safety Standards; Roof Crush Resistance; Phase–In Reporting Requirements" ("FMVSS"),

---

[5] Various auto manufacturers criticized the NHTSA's reliance on a study that linked roof intrusion and serious injury, and commented that a statistical correlation did not establish a causal relationship between the two. The agency agreed, to an extent, acknowledging that "as a general principle, a statistical correlation does not in itself prove that a causal relationship exists." 74 Fed.Reg. 22348, 22379.

74 Fed.Reg. 22348, 22378–22379 (final rule promulgated May 12, 2009) (codified at 49 C.F.R. §§ 571, 585) ("FMVSS 216 Final Rule"). The NHTSA has explained:

> [Some] arguments appear to imply that any difference in roof intrusion must be due to a difference in impact severity rather than roof strength or design . . . .
>
> There are logical reasons to believe that a collapsing roof that strikes an occupant's head at the nearly instantaneous impact velocity experienced when structures deform might cause serious injury. These types of injuries were documented . . . in a detailed investigation of 43 rollover crashes. The agency believes that the statistically significant relationship between roof intrusion and belted occupant injury . . . indicates not just a suggestion, but a probability that increasing roof strength reduces injuries.

The Parrs' Brief at 17–18; FMVSS 216 Final Rule, 74 Fed.Reg. at 22379.

As noted, the Parrs' motion *in limine* number one sought to preclude presentation of Ford's diving/torso augmentation theory to the jury, contending that after forty years of research, studies, tests, and experience, NHTSA specifically discredited this theory in FMVSS 216 Final Rule, and validated "roof crush" as the cause of head and neck injuries sustained by belted occupants in rollover motor vehicle accidents. In light of that finding, the Parrs maintain, NHTSA amended the roof crush rule to require substantial increases in roof strength applicable to all consumer vehicles. The Parrs argue the trial court should have deferred to NHTSA's expertise to preclude Ford from introducing evidence of diving and torso augmentation at trial.

The trial court concluded that the Parrs' support for their motion was lacking and stated:

[U]pon review of the documentation provided to the Court to support their motion, notably, the 2009 Amendment to the FMVSS (Federal Motor Vehicle Safety Standard) although suggestive of appellants' argument, failed to convince this Court that either of their arguments [was] meritorious. First, although the 2009 Amendment did cite statistical studies which found a correlation between roof crush and injury in rollover accidents, appellants' contention that the NHTSA amendment conclusively determined that a causal relationship existed between roof crush and head and neck injury in rollover accidents, to the exclusion of torso augmentation, was not proven. Although a correlation was shown[,] it did not provide, as appellants' were arguing, evidence showing that it was conclusive. As such, this Court determined that appellants' contention was without merit and denied their pre-trial motion which sought to preclude appellees from presenting evidence that "diving" or torso augmentation caused plaintiff, April Parr's injuries. Both appellees and appellants presented extensive expert testimony during trial on the subject of "roof crush" vs. "diving" as a cause of appellant, April Parr's injuries. In the end, the jury concluded that Ms. Parr's injuries resulted from "diving" not "roof crush" and found for the appellees.

Trial Court Opinion, 3/1/13, at 4–5.

Our review of FMVSS 216 Final Rule reveals that it did not categorically exclude diving/torso augmentation as a cause of head and neck injury in rollover crashes. The document merely states that in some cases roof crush "might" cause serious injury, which is a proposition with which Ford agreed.[6] Nothing in NHTSA's conclusion categorically excluded torso

---

[6] The Parrs suggested throughout trial that Ford's experts categorically denied that roof crush can ever cause injury; Ford's experts clearly

augmentation or diving as a potential cause of injury in rollover crashes. Thus, the Parrs' position that NHTSA determined "once and for all" that roof crush and not diving/torso augmentation caused head and neck injuries, such as those sustained by Mrs. Parr, among belted occupants in rollover accidents, simply is not supported by the literature.

While we have not found a Pennsylvania appellate case directly on point, we cite with approval **Campbell v. Fawber**, 975 F. Supp.2d 485

---

disagreed. For example, Ford's biomechanical engineering expert, Dr. Catherine Corrigan, testified:

> I've seen instances where roof crush has caused injury. And I have not opined that it doesn't.
>
> * * *
>
> I have seen instances where deformation of the roof has contributed to the injury. I have seen instances where it has not.
>
> So the fact that there are researchers who have said that roof crush can cause injury, that would be correct.

N.T., 3/19/12 (Morning Session), at 29. Dr. Corrigan later reiterated that "there is plenty of data out there to show instances where roof crush does matter in injury and does cause injury. In this case, because of the kinematics, it was not the cause of the injury." **Id**. at 28. Ford's expert on roof strength, Michael J. Leigh, testified that "Ford doesn't dispute that there could be situations where roof crush or roof deformation causes an injury." N.T., 3/7/12 (Morning Session), at 7, 34.

(M.D.Pa. 2013).[7,8]  The **Campbell** Court considered this precise issue and rejected it out of hand.

> Nothing contained in the agency's response suggests that the final rule categorically excluded torso augmentation or diving as a cause of head and neck injury in a rollover crash.  **To the contrary, the NHTSA's response was resolutely probabilistic**.  Furthermore, [the plaintiff] has shown nothing in the NHTSA's regulations that would suggest that the agency's study of roof crush injuries could prevent a party from presenting at trial evidence of an alternative explanation.

**Id**. at 501 (emphasis added)(footnote omitted).[9]  The trial court properly declined the Parrs' motion *in limine* number one and permitted Ford to put its diving/torso augmentation theory before the jury.

---

[7]  In their brief on reargument, the Parrs fail to acknowledge the federal court's decision in **Campbell**.

[8]  While "federal court decisions do not control the determinations of the Superior Court," **Kleban v. National Union Fire Insurance Co.**, 771 A.2d 39, 43 (Pa. Super. 2001), whenever possible, Pennsylvania courts "follow the Third Circuit [courts] so that litigants do not improperly 'walk across the street' to achieve a different result in federal court than would be obtained in state court.  [**Cellucci v. General Motors Corp.**, 676 A.2d 253, 255 n.1 (Pa. Super. 1996)] (citing **Commonwealth v. Negri**, 213 A.2d 670 (Pa. 1965), and **Murtagh v. County of Berks**, 634 A.2d 179 (Pa. 1993)." **NASDAQ OMX PHLX, Inc. v. PennMont Securities**, 52 A.3d 296, 303 (Pa. Super. 2012); **Werner v. Plater-Zyberk**, 799 A.2d 776, 782 (Pa. Super. 2002) (same).

[9]  The Parrs assert that the NHTSA's conclusion that roof crush is a cause of injury is entitled to deference under **Chevron v. National Resources Defense Council**, 467 U.S. 837 (1984).  The Parrs' Brief at 29.  In **Chevron**, the Supreme Court held that courts must give deference to an agency's reasonable interpretation of the statute that it administers.  **Chevron**, 476 U.S. at 842–843.  This claim, as well, was addressed by the **Campbell** Court, and we concur with its conclusion, as follows: "The court disagrees with [the plaintiff's] argument that the NHTSA conclusively

The Parrs next contend the trial court erred when it granted Ford's motion *in limine* number three to preclude all references to NHTSA rulemaking documents after 2001 and particularly, NHTSA 216 Final Rule, "on the basis that the [2001] Excursion was designed, manufactured, and sold in 2001," eight years before the Final Rule's publication. The Parrs' Brief at 31. The Parrs sought to admit evidence of these rulemaking documents to establish causation, to dispute Ford's diving/torso augmentation theory, and to impeach Ford's experts' reliance upon that theory. The Parrs' Brief at 33. The Parrs maintain that the trial court relied upon precedent concerning whether this evidence was admissible to establish a "defect," which was inapplicable to the Parrs' theory of roof crush causation. They suggest the 2001 date may have relevance to notice or negligence, but it has no relevance to the issue of causation or impeachment. *Id*.

Ford responds that the trial court acted within its discretion in excluding reference to post-2001 rulemaking activities that culminated in FMVSS 216 Final Rule. It suggests that evidence regarding a post-manufacture regulatory standard is irrelevant because it does not go to whether the Excursion's roof was defectively designed when it left the Ford

___

determined that roof crush is the *exclusive* cause of head and neck injury in rollover collisions and, therefore, it is unnecessary to address [the] ***Chevron*** argument." ***Campbell***, 975 F. Supp.2d at 502 n.4.

plant in 2001. Ford maintains that the documents also do not prove causation, they merely suggest that the Parrs' causation theory is possible, and that issue was not in dispute because Ford admitted it at trial. Thus, Ford argues that any marginal relevance was far outweighed by the likelihood that evidence of inapplicable government standards was likely to mislead the jury. Moreover, Ford maintains that the Parrs' claim is moot because the Parrs presented some of the evidence that they now assert was wrongly excluded.

In defending its decision to preclude references to NHTSA rulemaking documents after 2001, the trial court stated the following:

> Pennsylvania law requires that a plaintiff prove that an allegedly defective vehicle was defective at the time of manufacture. ***Duchess v. Langston Corporation***, 769 A.2d 1131, 1142 (Pa. 2001). However appellants sought to introduce NHTSA standards and rulemaking subsequent to the year the subject vehicle was manufactured. It was this Court's determination that the relevant time frame for assessing the design and/or defectiveness of the subject 2001 Ford Excursion was up to and including the year it was manufactured, 2001. The standards that were in place at that time (2001) were what was relevant to appellants' causes of action against the appellee, Ford Motor Company. At trial, appellees were permitted and did introduce evidence of NHTSA standards that existed up to the year 2001. This Court found appellants' contention that they should have been permitted to introduce NHTSA standards and rulemaking subsequent to the year 2001 without merit and accordingly granted appellees' pretrial motion precluding such evidence.

Trial Court Opinion, 3/1/13, at 5–6.

The trial court's order dated March 5, 2012, and filed March 27, 2012, relating to Ford's motion *in limine* number three, precluded reference to

"FMVSS 216, the 2009 Amendments to FMVSS 216, or Related Notices of Proposed Rulemaking . . . ." Order, 3/27/12, at 1 (docket entry 145). Initially, the Parrs failed to note the place in the record where the trial court declined admission of fifteen studies and publications, which the Parrs asserted were erroneously excluded by the trial court, thereby hampering our ability to address the issue as to all of the documents.[10] We address the

---

[10] Indeed, the Parrs initially failed to include any notes of testimony in the record certified to us on appeal, and this Court was compelled to seek supplementation of the record through our Prothonotary. As we stated in **Commonwealth v. Preston,** 904 A.2d 1, 6–8 (Pa. Super. 2006) (*en banc*) (some citations omitted):

> The fundamental tool for appellate review is the official record of the events that occurred in the trial court. **Commonwealth v. Williams**, 552 Pa. 451, 715 A.2d 1101, 1103 (1998). To ensure that an appellate court has the necessary records, the Pennsylvania Rules of Appellate Procedure provide for the transmission of a certified record from the trial court to the appellate court. **Id**. The law of Pennsylvania is well settled that matters which are not of record cannot be considered on appeal. **Commonwealth v. Bracalielly**, 540 Pa. 460, 658 A.2d 755, 763 (1995). Thus, an appellate court is limited to considering only the materials in the certified record when resolving an issue. **Commonwealth v. Walker**, 878 A.2d 887, 888 (Pa. Super. 2005). In this regard, our law is the same in both the civil and criminal context because, under the Pennsylvania Rules of Appellate Procedure, any document which is not part of the officially certified record is deemed non-existent—a deficiency which cannot be remedied merely by including copies of the missing documents in a brief or in the reproduced record. **Commonwealth v. Kennedy**, 868 A.2d 582, 593 (Pa. Super. 2005).

\* \* \*

claim as it pertains to the trial court's decision to preclude reference to the documents related to FMVSS 216 Final Rule.

The trial court granted Ford's motion *in limine* number three to the extent it sought to exclude reliance on NHTSA standards and rulemaking documents after 2001, the year the Parrs' Excursion was manufactured. It is undisputed that roof-strength standards in FMVSS 216 Final Rule did not apply to the Excursion because the vehicle, at 8,800 pounds, is beyond the "scope of [the] Safety Design Guideline, which stops at 8,500 pounds . . . ." N.T., 3/7/12 (Morning Session), at 53, 83. The rulemaking documents Ford sought to exclude in its motion *in limine* number three did not issue until years after 2001; they dated from 2005, when the NHTSA issued notice of proposed rulemaking to update FMVSS 216,[11] to 2009, when NHTSA issued the Final Rule. NPRM, "Federal Motor Vehicle Safety Standards; Roof Crush

---

> It is not proper for either the Pennsylvania Supreme Court or the Superior Court to order transcripts nor is it the responsibility of the appellate courts to obtain the necessary transcripts.
>
> In the absence of specific indicators that a relevant document exists but was inadvertently omitted from the certified record, it is not incumbent upon this Court to expend time, effort and manpower scouting around judicial chambers or the various prothonotaries' offices of the courts of common pleas for the purpose of unearthing transcripts . . . [that] never were formally introduced and made part of the certified record.

[11] The August 19, 2005 Notice of Proposed Rulemaking ("NPRM") was not an adopted standard, it was an open docket to receive comments regarding the proposal by NHTSA. NHTSA issued an NPRM in 2008 as well. Ford's Motion in Limine No. 3, Exhibit B (docket entry 92).

Resistance, 70 Fed.Reg. 49223 (proposed Aug. 23, 2005); FMVSS 216 Final Rule. Moreover, even after 2009, the updated standard did not apply to the Excursion. The FMVSS Final Rule does not apply to vehicles of the Excursion's gross vehicle weight grading *(i.e.*, between 6,000 and 10,000 pounds) until September 1, 2016. FMVSS 216 Final Rule, 74 Fed.Reg. at 22348; Ford's Motion *in Limine* No. 3, Exhibit D.

As we have stated, it is well settled that the decision to admit or exclude evidence is vested in the sound discretion of the trial court and will not be overturned on appeal absent an abuse of that discretion. ***Keystone***, 77 A.3d at 11. Additionally, to be admissible, evidence must be relevant.

> "Evidence that is not relevant is not admissible." Pa.R.E., Rule 402, 42 Pa.Cons.Stat.Ann. Relevant evidence is defined as evidence "having any tendency to make the existence of any *fact* that is of consequence to the determination of the action more probable or less probable." Pa.R.E., Rule 401, 42 Pa.Cons.Stat.Ann. (emphasis added). Even if evidence is relevant, it may be excluded if its probative value is outweighed by, *inter alia*, the danger of unfair prejudice arising from its presentation to the fact-finder. Pa.R.E., Rule 403, 42 Pa.Cons.Stat.Ann. "'Unfair prejudice' supporting exclusion of relevant evidence means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially." ***Commonwealth v. Wright***, 599 Pa. 270, 325, 961 A.2d 119, 151 (2008). "The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function." ***Commonwealth v. Parker***, 882 A.2d 488, 492 (Pa. Super. 2005), *aff'd on other grounds*, 591 Pa. 526, 919 A.2d 943 (2007).

***Lykes v. Yates***, 77 A.3d 27, 33 (Pa. Super. 2013) (emphasis in original).

We conclude the trial court correctly found that the standard enacted in 2009, which is not applicable until 2016, cannot form the basis for liability in this case, where the vehicle in question was manufactured in 2001. Thus, evidence of the FMVSS 216 Final Rule in 2009 and rulemaking activities from 2005 and 2008 leading up to the amendment properly were excluded. The Parrs were compelled to prove that the Excursion was defective at the time it was made. **See Duchess v. Langston**, 769 A.2d 1131, 1142 (Pa. 2001) ("[O]ur jurisprudence requires that products are to be evaluated at the time of distribution when examining a claim of product defect."). The FMVSS 216 Final Rule and rulemaking activities leading up to the amendment properly were circumscribed by the trial court's grant of Ford's motion *in limine* number three. **See Dunkle v. West Penn Power Co.**, 583 A.2d 814, 816 (Pa. Super. 1990) ("[I]n a strict liability action against the manufacturer of a product, safety standards promulgated after the sale of the product are irrelevant and inadmissible to show that the product was defectively designed or contained inadequate warnings when manufactured."). **See also Oberreuter v. Orion Industries, Inc.**, 398 N.W.2d 206 (Iowa App. 1986); **Aller v. Rodgers Machinery Manufacturing Co., Inc.**, 268 N.W.2d 830 (Iowa 1978); **Rice v. James Hanrahan & Sons**, 482 N.E.2d 833 (Mass. 1985); **Cover v. Cohen**, 461 N.E.2d 864 (N.Y. 1984); **Turner v.**

***General Motors Corp.***, 584 S.W.2d 844 (Tex. 1979); ***Majdic v. Cincinnati Machine Co.***, 537 A.2d 334 (Pa. Super. 1988).

Moreover, we reject the Parrs' assertion that even if the post-2001 rulemaking evidence was inadmissible to prove a defect, it was admissible to prove causation. The Parrs' Brief at 33. As noted, we have determined that the FMVSS 216 Final Rule and related documents demonstrated that roof crush is one of several potential causes of injury in rollover accidents. The record reveals that Ford readily admitted that fact. N.T., 3/7/12 (Morning Session), at 33–34, 97; N.T., 3/19/12 (Morning Session), at 64–71; N.T., 3/19/12 (Afternoon Session), at 27–28. Thus, the documents in question did not make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Pa.R.E. 401.

Further, despite the trial court's ruling on Ford's motion *in limine* number three, the Parrs did, in fact, place the NHTSA Final Rule's conclusion before the jury. ***See***, ***e.g.***, N.T., 3/7/12 (Morning Session), at 63; N.T., 3/19/12 (Afternoon Session), at 33–36. Indeed, during his closing argument, the Parrs' counsel suggested to the jury, "And this business about diving, torso augmentation, they can't convince NHTSA of that fact; yet they're trying to convince you . . . ." N.T., 3/21/12 (Volume I), at 51. In addition, the evidence encompassed by Ford's motion *in limine* number three

was cumulative to the myriad references by the Parrs to the NHTSA and roof crush causation. ***See***, ***e.g.***, N.T., 3/7/12 (Morning Session), at 41–42, 57–87; N.T., 3/7/12 (Afternoon Session), at 21–24, 102–104, 123–132, 138–143; N.T., 3/8/12 (Morning Session), at 35–87, 104;. N.T., 3/8/12 (Afternoon Session), at 77; N.T., 3/15/12 (Afternoon Session), at 44–45; N.T., 3/19/12 (Morning Session), at 27–29; N.T., 3/19/12 (Afternoon Session), at 29–36, 72–83; N.T., 3/20/12 (Afternoon Session), at 28.

Also, in order for a trial court's ruling on an evidentiary matter to constitute reversible error requiring the grant of a new trial, the ruling must be both legally erroneous and harmful to the complaining party. ***Winschel***, 925 A.2d at 794. If the error in the admission of the evidence had no effect on a verdict, the error does not require the grant of a new trial. Herein, the Parrs assert that the admission of the documents would have proven causation. As noted, however, the jury never reached the issue of causation. Jury Verdict Form, 3/23/12.

The Parrs further suggest the trial court should have allowed them to utilize the materials in order to impeach Ford's expert witnesses. The Parrs' Brief at 35–36. This argument fails. First, the record reveals that the Parrs **did** impeach Ford's experts with NHTSA's conclusions regarding roof crush. ***See, e.g.***, N.T., 3/19/12 (Afternoon Session), at 38–43 (impeaching Dr. Corrigan with NHTSA's conclusions); N.T., 3/7/12 (Morning Session), at 32–

34 (impeaching Michael Leigh with NHTSA's conclusions); N.T., 3/20/12 (Afternoon Session), at 29–30 (impeaching Dr. Roger Nightengale, a research professor in the department of biomedical engineering at Duke University, with NHTSA's conclusions).

Second, Pa.R.E. 607(b) & cmt notes that "there are limits on the admissibility of evidence relevant to the credibility of a witness," including the provisions of Pa.R.E. 403 whereby the court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 607 (b); Pa.R.E. 403. Thus, as Ford asserts, "For the same reasons post-2001 NHTSA rulemaking documents were not admissible for their truth," they were not available for impeachment. Ford's Brief at 32.

Finally, as Ford posits, "there was nothing to impeach Ford's witnesses on." Ford's Brief at 32. Ford's experts conceded that roof crush may be a cause of injury in some cases, **see** note 7 *supra*, which is precisely what the post-2001 NHTSA rulemaking documents demonstrate. Hence, we conclude the trial court did not abuse its discretion in granting Ford's motion in limine number three.

Next, related to the trial court's grant of Ford's motion *in limine* number nine, the Parrs contend that they should have been permitted to

present statistical evidence prepared by NHTSA, the Insurance Institute for Highway Safety ("IIHS"), the National Center for Statistics and Analysis, Fatality Analysis Reporting System ("FARS"), and the National Automotive Sampling System ("NASS") concerning rollover fatalities involving Ford Excursions and other "comparable" vehicles. The Parrs assert that the trial court abused its discretion in granting Ford's motion *in limine* number nine to preclude post-2001 epidemiological studies and publications that demonstrated that 2001–2004 Ford Excursions had rollover driver and occupant death rates higher than comparable "large" and "extra-large" sport utility vehicles, on the basis that the Parrs could not satisfy the "substantially similar" test. The Parrs' Brief at 39.

Ford contends the trial court acted within its discretion in excluding the statistical studies because they involved a wide variety of accidents, injuries, and vehicles. Ford asserts that because the Parrs failed to show the requisite similarity to the instant accident, the studies, and the statistics upon which they relied were not relevant within the meaning of Pa.R.E. 401.[12] Ford also avers that the studies were inadmissible hearsay

---

[12] Pa.R.E. Rule 401(a) provides as follows:

**Rule 401. Test for Relevant Evidence**

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence . . . .

and highly prejudicial. Finally, Ford counters that notwithstanding the trial court's ruling, the Parrs' counsel and experts presented many of these statistics to the jury.

The trial court stated the following regarding this issue:

> Appellants next argue that this court erred in granting Appellee's Motion in Limine No. 9 which sought to preclude any references during trial to statistical evidence of other dissimilar accidents. Both parties had an opportunity to argue this Motion *in Limine* before this Court prior to trial. Appellants contend that this Court committed an error of law and/or abused its discretion when it granted Appellees' Motion in Limine No. 9. According to Appellants, this Court "altogether precluded Plaintiffs/appellants from offering statistical evidence prepared by NHTSA, The Insurance Institute for Highway Safety (IIHS), the Fatal Accident Reporting System, and/or the National Automotive Sampling System as to rollover fatalities involving the subject vehicle and comparable vehicles on the basis that Appellees were unable to prove that the statistics derived from other rollover accidents that [sic] were virtually identical to the one in the instant accident."
>
> As [A]ppellants acknowledge, it was their burden, as the proponent of this evidence, to establish, to the court's satisfaction, the similarity between other accidents and the subject accident before this evidence could have been admitted for any purpose. ***Hutchinson v. Penske Truck Leasing Co.***, 876 A. 2d 978 (Pa. Super. 2005). During argument before this Court, Appellants failed to show the required similarity between the subject accident and those contained within the statistical compilations. Notably, the IIHS reports, unlike the subject accident, involved fatalities. Appellants could not establish that the facts surrounding the accidents that comprised the statistical analysis they wished to introduce before the jury were

_____

While noting the rule is identical to F.R.E. 401, the comment to the Rule 401 states, in pertinent part: "Whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason, experience, scientific principles and the other testimony offered in the case." Pa.R.E. 401, cmt.

> substantially similar to those in the subject accident. As it was Appellants' burden, this Court found that they had not met their burden and granted Appellees' Motion to Preclude the Statistical Evidence.

Trial Court Opinion, 3/1/13, at 6–7. We agree with the trial court's conclusion that the Parrs failed to show that various expert reports and the relevant statistical studies and compilations upon which those reports relied were substantially similar to the instant case; thus, the trial court properly granted Ford's motion *in limine* number nine and circumscribed the evidence.

The Parrs were precluded from referencing (1) data compiled by IIHS, which contained fatality facts obtained from the FARS database; (2) IIHS evidence that compared mortality rates of Ford Excursions in rollover accidents to other large or extra-large sport utility vehicles from other manufacturers involved in rollover accidents; and (3) IIHS documents comparing roof strengths of various makes and models during rollover accidents. This Court has stated:

> Evidence of prior accidents involving the same instrumentality is generally relevant to show that a defect or dangerous condition existed or that the defendant had knowledge of the defect. However, this evidence is admissible only if the prior accident is sufficiently similar to the incident involving the plaintiff which occurred under sufficiently similar circumstances. The burden is on the party introducing the evidence to establish this similarity before the evidence is admitted.

> ***Lockley v. CSX Transp., Inc.***, 5 A.3d 383, 395 (Pa. Super. 2010) (citation omitted).
>
> > "Determining whether and to what extent proffered evidence of prior accidents involves substantially, similar circumstances will depend on the underlying theory of the case advanced by the plaintiffs." ***Bitler v. A.O. Smith Corp.***, 400 F.3d 1227, 1239 (10th Cir. 2004). "If the evidence of other accidents is substantially similar to the accident at issue in a particular case, then that evidence will assist the trier of fact by making the existence of a fact in dispute more or less probable, and the greater the degree of similarity the more relevant the evidence." ***Id.*** "Naturally, this is a fact-specific inquiry that depends largely on the theory of the underlying defect in a particular case." ***Id.*** Accordingly, a wide degree of latitude is vested in the trial court in determining whether evidence is substantially similar and should be admitted. ***Lockley***, 5 A.3d at 395.

***Blumer v. Ford Motor Co.***, 20 A.3d 1222, 1228–1229 (Pa. Super. 2011).

It is noteworthy, as well, that statistical compilations of accidents and studies that cite statistical compilations of accidents, must satisfy the substantial similarity test. ***Hutchinson v. Penske Truck Leasing Co.***, 876 A.2d 978 (Pa. Super. 2005). In ***Penske***, this Court rejected as "frivolous and illogical" the claim that "expert reports do not constitute 'other accident' evidence because [the appellant] presented no single other accident to the jury but rather presented only the reports' conclusions from studies of hundreds of other accidents." ***Id***. at 985. "To suggest, as [Mr.] Hutchinson does, that the underlying nature of this evidence of other accidents was transformed, merely because it was compiled, analyzed, and summarized to

generate conclusions, defies both logic and common sense." *Id*. at 985-986.

It is clear that the Parrs were compelled to satisfy the substantial similarity test, and because they did not, the statistical compilations properly were excluded. Therefore, we agree with the trial court that the evidence in question did not meet the substantial similarity test. For example, the facts from the FARS database referenced by the Parrs included passenger vehicle **deaths** in frontal impacts and side impacts as well as rollovers, some involving single vehicle accidents and others occurring in multi-vehicle crashes. The Parrs' Brief at 38–39. Other publications and data the Parrs sought to admit reported mortality rates, roadway design, and roof strength evaluations of large luxury cars, large family cars, small pick-up trucks, with little or no mention of the specifics of each accident cited therein. *Id*. at 39–40. *See*, *e.g.*, IIHS status report, "The Risk of Dying in One Vehicle Versus Another," Vol. 40, No. 3, March 19, 2005, the Parrs' Exhibit 13; the Parrs Brief at 39. The publications involved fatalities, not neck injuries, did not necessarily relate to Ford Excursions, and failed to account for seat belt usage and other variables.

The record reflects that the Parrs did not present evidence as to the substantial similarity of the reports to the Excursion, the accident, or the circumstances in this case. Thus, none of the information in the reports was

shown to be directly relevant to the Excursion and to the accident at issue. The Parrs made no attempt to demonstrate that the underlying accidents in the statistical compilations were substantially similar to the instant accident. The Parrs had the burden to prove substantial similarity, and they failed to carry the burden. **Penske**.[13] The issue lacks merit.

The Parrs' final issue relates to whether the trial court committed an error of law and abused its discretion when it denied the Parrs' motion *in limine* number ten to preclude Ford from: (a) presenting evidence that the 2001 Excursion was not preserved and (b) obtaining a spoliation charge. Specifically, the Parrs contend the trial court erred in issuing a spoliation charge to the jury and in permitting extensive introduction of spoliation evidence where Ford was unable to demonstrate any prejudice that resulted from the destruction of the 2001 Excursion.

Ford proffers that the trial court's decision to instruct the jury that it could infer that the Excursion contained evidence unfavorable to the Parrs was within the court's broad discretion. The Parrs stipulated that they failed to preserve the vehicle even though they had ample opportunity to do so

---

[13] Despite the grant of Ford's Motion *in Limine* No. 9, the trial court permitted the Parrs to cross-examine Ford's experts with statistics and studies. **See**, **e.g.**, N.T., 3/8/12 (Morning Session), at 49–56 (use of NASS studies); N.T., 3/15/12 (Afternoon Session), at 42–48 (use of NASS studies); N.T., 3/16/12 (Morning Session), at 124–125 (FARS data); N.T., 3/19/12 (Morning Session), at 4–6, 17–19 (use of IIHS data, use of NASS studies).

after retaining counsel. Thus, Ford never had the chance to examine the vehicle, and Ford's experts explained how the vehicle's absence negatively impacted their analyses. Ford maintains that any error in this regard was harmless because the Parrs asserted that the excluded evidence would have aided their case on causation, but the jury did not reach causation in returning a defense verdict. Thus, Ford responds that the Parrs cannot show that the trial court committed an error of law that controlled the outcome of the case.

The trial court resolved this issue as follows:

This Court initially deferred ruling on the motion. However, prior to making a decision this Court did permit appellee, Ford, to introduce facts about the unavailability of the vehicle and its impact on the experts' investigation into the cause of the accident and the injuries sustained by the occupants. As such, [A]ppellants' counsel during cross-examination of [A]ppellees' experts called into question their opinions and conclusions, based upon the fact that the subject vehicle was not available for them to examine and inspect.

Further, at trial the parties stipulated as to the facts surrounding the unavailability of the vehicle. Notably, [A]ppellants stipulated that two weeks after the accident and after hiring counsel, they released the vehicle to their insurance company who in turn sold the vehicle which was then destroyed. Appellants further stipulated that they did not attempt to locate the vehicle until after it had been destroyed and that appellees were not notified of legal action until after the vehicle was [destroyed].

In light of the above stipulation and arguments and briefs of counsel, this Court denied [A]ppellants' Pre-trial Motion to Preclude and accordingly allowed the jury to make whatever conclusions it deemed proper. Accordingly, this Court gave a permissive adverse inference instruction to the jury, instructing

that it could, but was not required to, draw a negative inference against appellants from the destruction and thus absence of the subject vehicle. Clearly appellants, despite their hiring of counsel and their knowledge of their pursuit of a legal action resulting from the accident, transferred the subject vehicle out of their possession resulting in it being subsequently destroyed, thereby preventing appellees from having the vehicle inspected so as to properly defend themselves from [A]ppellants' allegations.

Trial Court Opinion, 3/1/13, at 7–8.

"Spoliation of evidence" is the failure to preserve or the significant alteration of evidence for pending or future litigation. *Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011). "When a party to a suit has been charged with spoliating evidence in that suit (sometimes called "first-party spoliation"), we have allowed trial courts to exercise their discretion to impose a range of sanctions against the spoliator." *Id*. (citing *Schroeder v. Commonwealth, Department of Transportation*, 710 A.2d 23, 27 (Pa. 1998)) (footnotes omitted). This Court has stated:

"When reviewing a court's decision to grant or deny a spoliation sanction, we must determine whether the court abused its discretion." *Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division*, 781 A.2d 1263, 1269 (Pa. Super. 2001) (citing *Croydon Plastics Co. v. Lower Bucks Cooling & Heating*, 698 A.2d 625, 629 (Pa. Super. 1997) (recognizing that "[t]he decision whether to sanction a party, and if so the severity of such sanction, is vested in the sound discretion of the trial court")). Such sanctions arise out of "the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the evidence." *Mount Olivet*, 781 A.2d at 1269 (quoting *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st

Cir.1982)). Our courts have recognized accordingly that one potential remedy for the loss or destruction of evidence by the party controlling it is to allow the jury to apply its common sense and draw an "adverse inference" against that party. **See Schroeder v. Commonwealth of Pa., Dep't of Transp.**, 551 Pa. 243, 710 A.2d 23, 28 (1998). Although award of summary judgment against the offending party remains an option in some cases, its severity makes it an inappropriate remedy for all but the most egregious conduct. **See Tenaglia v. Proctor & Gamble, Inc.**, 737 A.2d 306, 308 (Pa. Super. 1999) ("Summary judgment is not mandatory simply because the plaintiff bears some degree of fault for the failure to preserve the product.").

To determine the appropriate sanction for spoliation, the trial court must weigh three factors:[14]

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

**Mount Olivet**, 781 A.2d at 1269–70 (quoting **Schmid v. Milwaukee Elec. Tool Corp.**, 13 F.3d 76, 79 (3d Cir. 1994)). In this context, evaluation of the first prong, "the fault of the party who altered or destroyed the evidence," requires consideration of two components, the extent of the offending party's duty or responsibility to preserve the relevant evidence, and the presence or absence of bad faith. **See Mt. Olivet**, 781 A.2d at 1270. The duty prong, in turn, is established where: "(1) the plaintiff knows that litigation against the defendants is pending or likely; and (2) it is foreseeable that discarding the evidence would be prejudicial to the defendants." **Id.** at 1270–71.

**Creazzo v. Medtronic, Inc.**, 903 A.2d 24, 28–29 (Pa. Super. 2006).

---

[14] While our review suggests the trial court has not explained its decision in light of the weight of these factors, the Parrs do not state their issue in such a manner, and we are able to evaluate the issue despite the lack of the trial court's analysis.

The record reveals that there is no dispute that the Parrs were responsible for the destruction of the Excursion and thus, were at fault. The stipulation concerning the destruction of the vehicle was as follows:

Two days after the accident, on July 23, 2009, Mr. Parr took pictures of the subject Excursion while it was in storage at a nearby towing company.

The Parrs retained [counsel] on August 4, 2009.

On August 4, 2009, Mr. Parr released the Ford Excursion to Progressive Insurance Company.

On August 27, 2009, [the Parrs] signed off on the title for the subject vehicle as a total loss.

The Excursion was sold on September 21, 2009, and, thereafter, destroyed by the purchaser.

[The Parrs] and their counsel did not attempt to locate the subject vehicle until October 9, 2009.

[The Parrs] initiated this action by filing a complaint on January 5, 2010.

No notice was given to Ford Motor Company or McCafferty Ford Sales of pending legal action prior to the date the vehicle was disposed of.

No notice or opportunity to inspect the vehicle was given to Ford Motor Company or McCafferty Ford Sales prior to the date the vehicle was disposed of.

N.T., 3/15/12 (Morning Session), at 30–31.

We examine the factors to determine whether the trial court properly denied the Parrs' motion *in limine* number ten and chose the appropriate sanction to impose. Clearly, the Parrs alone had the capacity to preserve the Excursion given the fact that they hired counsel six to seven weeks

before the vehicle's destruction. It was "foreseeable that discarding the evidence would be prejudicial to the defendants," ***Mt. Olivet Tabernacle Church v. Edwin L. Wiegand Div.***, 781 A.2d 1263, 1271 (Pa. Super. 2001), because Mr. Parr took photographs of the vehicle two days after the accident, indicating that he recognized the vehicle's value as evidence.

Second, Ford clearly was prejudiced by the Excursion's destruction.[15] Multiple expert witnesses stated that their analyses would have been aided by examination of the vehicle. Even the Parrs' expert Dr. Geoffrey Germane testified, "[I]n a rollover crash, the vehicle is the best witness. It contains information about the rollover that might not be otherwise available." N.T., 3/15/12 (Morning Session), at 57. Furthermore, on cross-examination Ford expert Dr. Catherine Ford stated, "I can't say, unfortunately, exactly where [April Parr] impacted because we don't have the vehicle." N.T., 3/19/12 (Afternoon Session), at 17. Ford expert Dr. Harry Lincoln Smith testified that he "would have liked to" examine the Excursion, which was necessary in "making a complete analysis." ***Id***. at 96.

---

[15] We reject the Parrs' suggestion that they did not have an advantage over Ford because their experts similarly did not examine the Excursion. While no Pennsylvania case has stated as much, we underscore our agreement with other jurisdictions that a spoliator cannot avoid sanctions by arguing "he has been prejudiced by his own dereliction." ***Lord v. Nissan Motor Co., Ltd.***, 2004 WL 2905323 (D.Minn. Dec. 13, 2004); ***see also Trull v. Volkswagen of America, Inc.***, 187 F.3d 88, 95–96 (1st Cir. 1999) (rejecting the plaintiffs' arguments that the defendants were not unfairly disadvantaged because the plaintiffs' experts also could not examine the subject vehicle).

Finally, the trial court had a range of sanctions from which to choose once it decided to impose one. Ford had requested that the trial court grant summary judgment as a sanction for the Parrs' destruction of the Excursion. Although the award of summary judgment against an offending party remains an option in some cases, its severity makes it an inappropriate remedy for all but the most egregious conduct. *See Tenaglia v. Proctor & Gamble, Inc.*, 737 A.2d 306, 308 (Pa. Super. 1999) ("Summary judgment is not mandatory simply because the plaintiff bears some degree of fault for the failure to preserve the product."). Indeed, "dismissal of a complaint or preclusion of evidence regarding an allegedly defective product is an extreme action reserved only for those instances where an entire product or the allegedly defective portion of a product is lost, spoiled or destroyed." *Mensch v. Bic Corp.*, 1992 WL 236965 at 2 (E.D.Pa. Dec. 17, 1992) (emphasis added); *Woefel v. Murphy Ford Co.*, 487 A.2d 23 (Pa. Super. 1985).

In the instant case, the trial court chose to charge the jury that it was permitted, although not required, to draw an adverse inference against the Parrs for destruction of the Excursion, which was the least severe of the possible sanctions. *See Schroeder*, 710 A.2d at 28. The Parrs do not, and cannot, dispute that the permissive adverse inference instruction is a lesser sanction than outright dismissal or the grant of summary judgment. *See*

***Schroeder***, 710 A.2d at 28 (instructing that "lesser sanction such as a jury instruction on the spoliation inference is warranted").  The trial court did not err in giving the lesser sanction of an adverse inference instruction.

Having concluded that the trial court did not abuse its discretion in any of the evidentiary rulings identified by the Parrs, and for the above stated reasons, the judgment in favor of Ford must be affirmed.

Judgment affirmed.

President Judge Emeritus Ford Elliott, President Judge Emeritus Bender, Judge Bowes, Judge Allen, Judge Stabile and Judge Jenkins join the Opinion.

Judge Wecht files a Concurring Opinion in which Judge Ott joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/22/2014</u>